UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER D. MASTERS,

      Plaintiff,

v.

CLASS APPRAISAL, INC.,

      Defendant.

Case No. 2:17-cv-11283-LJM-EAS
Honorable Laurie J. Michelson
Magistrate Judge Elizabeth A. Stafford

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

---

When Jennifer Masters first started working for Class Appraisal as a reviewer of residential-property appraisals, she went into the office. But in time, Masters' multiple sclerosis made it difficult for her to work on-site. Under Masters' account, she requested and obtained an accommodation to work at home. Under Class Appraisal's account, the company had launched a work-at-home pilot program wholly unrelated to accommodating an employee's disability. After four or so employees worked at home for about three months, Class Appraisal decided that no employee would be allowed to work at home any longer. The company believed that reviewing appraisals on a computer at home risked compromising confidential information. Thereafter, Masters repeatedly asked for a work-at-home accommodation and supported her request with a note from her physician. Yet Class Appraisal never obliged. As Masters did not return to the office, she was terminated.

Masters then sued. Her complaint asserts violations of the Americans with Disabilities Act and Michigan's Persons with Disabilities Civil Rights Act. Class Appraisal believes that Masters lacks the evidence to persuade any reasonable jury to find for her. So Class Appraisal asks this

Court to grant it summary judgment. For the reasons that follow, the motion will be granted as to Masters' retaliation claims but denied as to Masters' discrimination claims.

## I.

## A.

Some general information about the parties provides a backdrop for the particulars of this case.

Class Appraisal was, apparently, a byproduct of the home-loan industry's recent overhaul. The Home Valuation Code of Conduct and, later, the Dodd-Frank Wall Street Reform and Consumer Protection Act, reduced the amount of direct contact between lenders and appraisers. *See* Lei Ding and Leonard Nakamura, *The Impact of the Home Valuation Code of Conduct on Appraisal and Mortgage Outcomes* at 1–2 & n.7 (July 2015), https://bit.ly/2mdXPxz. To be more specific, by at least 2011, appraisals were required to go through a middle man: appraisal management companies. *See id.*; (ECF No. 14, PageID.178–179.) (These companies had existed well before the economic downturn, but their role in the lending industry changed after. *See* Ding, *supra* at 2.) Under the new laws, lenders and appraisers had to work through an intermediary so that the lender would not know who was appraising a home and the appraiser would not know for which lender it was conducting the appraisal. (ECF No. 14, PageID.178–179.) The aim was to eliminate conflicts of interest that led to overvaluation of homes. *See* Ding, *supra* at 2; (ECF No. 14, PageID.178–179). Class Appraisal was an appraisal management company operating as a middle man between appraisers and lenders. (ECF No. 14, PageID.177.)

Jennifer Masters holds a real-estate appraisal license and a college degree. (ECF No. 17, PageID.368–369.) In 2010, Masters was diagnosed with multiple sclerosis or a similar neurologic condition. (ECF No. 14, PageID.310; ECF No. 17, PageID.392, 424, 467.) Her symptoms include

pain and numbness. (ECF No. 17, PageID.424.) Walking and balancing can also be difficult. (ECF No. 17, PageID.424, 442.) So too bladder and bowel control. (ECF No. 14, PageID.310; ECF No. 17, PageID.424.) And her multiple sclerosis keeps her from driving long distances. (ECF No. 17, PageID.374, 392, 435.)

**B.**

With that backdrop, the Court turns to the facts that led to this case (viewed in the light most favorable to the non-moving party, Masters).

Masters began working at Class Appraisal in February 2012. (ECF No. 14, PageID.119.) Her job was a quality-control reviewer; she reviewed residential appraisals using an online program called "Mercury." (ECF No. 14, PageID.135; ECF No. 17, PageID.384–385, 393.) When Masters started with Class Appraisal, she worked on-site, which was about a forty-minute commute from her home. (ECF No. 14, PageID.392.)

In October 2012, Masters began working from home. The parties disagree as to why.

Class Appraisal says that the company was growing quickly, that it lacked space for workers in its office, and that a lot of work was piling up. (ECF No. 14, PageID.197–199.) So Class Appraisal's then-CEO, Mark Backonen, launched a "pilot" work-at-home program to solve the space problem and reduce the backlog. (ECF No. 14, PageID.198, 216.) According to Backonen, Masters "was one of a group of people that were interested in this beta program to see if we could perform the quality control program from a remote site through a [virtual private network]." (ECF No. 14, PageID.198; *see also* ECF No. 14, PageID.216–217.) Ultimately, somewhere between three and five Class Appraisal employees started working from home in October 2012. (ECF No. 14, PageID.304; ECF No. 14, PageID.288–289; ECF No. 14,

PageID.300.) The pilot program was neither formalized nor documented. (ECF No. 14, PageID.215, 289).

Masters says she started working at home in October 2012 for a different reason. In fact, at the time, Masters was not even aware that a pilot program existed. (*See* ECF No. 17, PageID.421.) Masters recalls that she began working at home as an accommodation for her multiple sclerosis. (*See* ECF No. 17, PageID.473.) In particular, Masters says that in October 2012, she provided her team manager, Arkady Gralnik, a note from her neurologist stating that she needed to work at home. (ECF No. 17, PageID.422.) Masters was under the impression that Gralnik had then obtained approval for her to work at home from Backonen. Although Backonen says that the notion that Masters was granted work-at-home as an accommodation for a disability is "absolutely incorrect" and "not true" (ECF No. 14, PageID.199), Masters' account has corroboration. On October 22, 2012, Masters' neurologist wrote a note that stated, "We recommend Jennifer work at home. Her inability to ambulate steadily, her fatigue and her pain make it unrealistic to work in an office setting." (ECF No. 17, PageID.442.)

But whether because of a disability accommodation or the pilot program (or both), Masters started working at home beginning in October 2012. And things apparently were fine for a time. From Masters' perspective, she was "more productive" at home. (*See* ECF No. 17, PageID.473.) And while there is some indication that Masters may have been off task or inefficient at times (ECF No. 17, PageID.446, 448), the record reflects only two such incidents, and Masters has explained away one (*see* ECF No. 14, PageID.144).

In early January 2013, Masters received a call from Gralnik telling her that she needed to return to the office if she wanted to keep working for Class Appraisal. (ECF No. 17, PageID.423.) Gralnik did not tell Masters the reason—other than to say that no Class Appraisal employees were

allowed to work at home any longer. (*Id.*) So Masters called Bill Stoops, Class Appraisal's operations manager at the time.

Masters and Stoops spoke on the phone on January 22, 2013. (*See* ECF No. 17, PageID.319, 421, 475.) During that call, Stoops apparently asked Masters to provide medical support for her need to work at home. (*See* ECF No. 14, PageID.138; ECF No. 17, PageID.319, 421, 475.) And while it is not clear if it was during the January 22 call or a later one, Stoops testified, "We discussed . . . that she had trouble walking and I said, well, we can make sure she had close parking and that her desk would be close to the door. . . . She mentioned something about going to the rest room often, so . . . I said we can make sure we can put you close to the facilities as well." (ECF No. 14, PageID.253.) According to Stoops, Masters stated that it would be too hard for her to come into the office. (*Id.*)

Two more things relevant to this case happened on January 22, 2013. For one, Class Appraisal terminated Masters' remote computer access. (*See* ECF No. 17, PageID.421.) For another, Masters' doctor faxed a note to Class Appraisal. It read, "Jennifer Masters is under our neurological care. We feel it is medically necessary for her to work from home due to her neurologic symptoms." (ECF No. 17, PageID.467.)

Over the next two days, Masters and Stoops engaged in a lengthy email conversation regarding her work-at-home status.

On January 23, Stoops confirmed that Class Appraisal had received the doctor's note; Stoops added, "We have consulted our HR team regarding your request to work from home. All positions within Class Appraisals not current[ly] being conducted at [our Troy office] have been eliminated. . . . The company has been and is willing to make reasonable accommodations for you to work within our office . . . . The management of the [work from home] program has created

hardship for the company and no longer [is] a viable option." (ECF No. 17, PageID.474.) Masters tried to clarify that she was not part of a work-at-home program: "As I told you on the phone yesterday[,] I was never part of a 'work from home program'. . . . I was given permission to work at home by the CEO, Mark Ba[c]konen and QC Manager at the time, Arkady [Gralnik,] because of a health condition and recommendation by my neurologist." (ECF No. 17, PageID.473.) Masters sought a "face-to-face meeting." (*Id.*)

The email conversation continued into the next day, January 24, 2013. Masters informed Stoops that she was still not able to log in from home, welcomed a face-to-face meeting, and questioned whether Class Appraisal was genuinely willing to make reasonable accommodations for her to work on-site. (ECF No. 17, PageID.472–473.) Masters explained, "The reasonable accommodation for my health condition has been for me to work from home since October 19th of last year from upper management. It had nothing to do with an at-home-work program." (*Id.*) Stoops responded by largely quoting his email from the prior day. (ECF No. 17, PageID.472.) Masters replied by again stating that she had been working at home as an accommodation and that she wanted to meet with upper management. (ECF No. 17, PageID.471.) Masters included a hyperlink to a U.S. Equal Employment Opportunity Commission webpage on teleworking. (*Id.*) To this, Stoops gave Masters an ultimatum: "At five pm today is our deadline – two choices: 1. Work in the office . . . . 2. Do not work in the office." (ECF No. 17, PageID.470.)

Masters did not respond by that deadline, so Stoops set Masters' employment status to "voluntary resignation." (ECF No. 17, PageID.469.)

Masters' termination from Class Appraisal did not end the discussion about a work-at-home accommodation. On Friday, January 25, Masters wrote to Stoops: "You have not offered to help me maintain my position in my unfortunate condition. The only two choices you have been

giving me have seemed like nothing more than threats, not helping to maintain a valuable employee. You have not even agreed to have a face-to-face meeting upon repeated requests to even find out why I need to remain working from home and how it only benefits the company." (ECF No. 17, PageID.469–470.)

Backonen, the CEO of Class Appraisal, had been copied on the emails between Masters and Stoops. The following Monday, January 28, Backonen emailed Masters: "Hi Jennifer, Class no longer offers a work at home program. This was a short term experiment when we were operating at capacity. All of the other work at home people are now working in the office again. I do not know anything about your condition, but the work at home program is no longer active. We can accommodate you when you return to work in the office if you have special needs." (ECF No. 17, PageID.481.) Masters was skeptical of Backonen's lack of knowledge about her health. For one, Backonen had seen Masters using a cane in the office and they had discussed her health. (ECF No. 17, PageID.481.) For another, Gralnik had requested medical documentation for her back in October 2012, a point that Masters brought up in her response to Backonen. (ECF No. 17, PageID.481.) Still, Backonen stuck to his position: "Jennifer, I have no knowledge what your condition is and have never discussed it in any detail with anybody. I still don't understand what you are going through. . . . Please contact an attorney if needed. . . . You need to make a decision to either come back to our office or do something else." (ECF No. 17, PageID.482.)

Masters took Backonen's advice. The next day, January 29, 2013, she completed an "Intake Questionnaire" for the EEOC. (ECF No. 17, PageID.425.) In the completed questionnaire, Masters told the EEOC that she had been granted the right to work at home as an accommodation for a "neurologic condition," that she was called back to the office in January 2013, that her attempts to

explain an accommodation had fallen on deaf ears, and that she had requested a face-to-face meeting to no avail. (*See* ECF No. 17, PageID.421–424.)

Around this time, Class Appraisal hired its first in-house counsel, John Hamameh. (ECF No. 14, PageID.276.) Hamameh testified that one of his "first responsibilities" was to contact Masters "and try to figure something out." (ECF No. 14, PageID.286.)

It appears that Masters reached out first. On February 5, 2013, Masters emailed Class Appraisal about a letter from her physician. (*See* ECF No. 14, PageID.306.) The same day, Stoops received a follow-up email from an organization that assists employers in complying with the Americans with Disabilities Act (*see* https://askjan.org); the email informed Stoops that "[c]hanging the location where work is performed may fall under the ADA's reasonable accommodation requirement of modifying workplace policies, even if the employer does not allow other employees to telework." (ECF No. 17, PageID.484.) Stoops forwarded the email to Hamameh.

The next day, Hamameh contacted Masters. "In your recent correspondence, dated February 5, 2013, we received a letter from your physician, Howard Rossman. We do completely sympathize with your position, and we are more than willing and open to accommodate you to ensure your continued employment with us. . . . We are open to sitting down with you to try to come up with a plan that will accommodate you sufficiently, such as a specific location of your desk or any other 'reasonable accommodations.'" (ECF No. 14, PageID.306.) Hamameh added, "The decision to run a trial of in-home employment was a companywide trial, and was never based on your medical condition." (*Id.*)

Over the next two days, February 7 and 8, Masters and Hamameh exchanged emails. Masters explained that she had never heard of any trial work-at-home program, that she had been

permitted to work from home for health reasons, and that she needed to work from home. (ECF No. 14, PageID.305.) Hamameh gave a more complete explanation for why the program was terminated: "Our work-at-home trial was based on the amount of space we have in our office. We had a total of three employees partake in the process. Ultimately, we decided that due to the industry we work in and the highly regulated security concerns of our customers['] private information, it is not feasible to continue that program." (ECF No. 14, PageID.304.)

Class Appraisal never did allow Masters to work from home; Masters never did return to the office.

In March 2013, Class Appraisal responded to Masters' EEOC charge. (ECF No. 14, PageID.299–301.) Unlike the explanation provided to Masters, Class Appraisal gave the EEOC a detailed justification for terminating the work-at-home program. In particular, Hamameh told the EEOC that the program was terminated for three reasons: (1) Class Appraisal had leased larger office space, (2) it was difficult to track the productivity of those working at home, and (3) there were concerns about data security. (ECF No. 14, PageID.300.) Hamameh expanded on the last point: "As the [appraisal-management-company] industry is so highly regulated, our management decided that compliance within these regulations would be far too difficult for allowing employees the ability to work from home. In conducting our business, we are dealing with Non Public Personal Information of our customers on a daily basis. As defined in the Gramm Leach Bliley Act, this type of information can only be sent thru secured or encrypted methods and must be taken care of with extreme sensitivity." (ECF No. 14, PageID.300.)

Backonen later testified consistently with Class Appraisal's EEOC response. At his deposition in this case, Backonen stated, "[A]fter reviewing the work-at-home program that she was participating in, . . . we didn't feel it was compliant with the regulations that we were required

to follow, because the appraisal itself, the document became a protected document for financial privacy. . . . Now you have to look at . . . what kind of encryption and other things that are on [the employee's] personal computer, which we didn't have any reason to believe . . . any of them would be able to do that." (ECF No. 14, PageID.201–203.) Thus, said Backonen, "the program was canceled." (ECF No. 14, PageID.203.)

After being cut off from the system on January 22, 2013, Masters never reviewed appraisals for Class Appraisals again.

## C.

About four years later, in April 2017, Masters filed this lawsuit against Class Appraisal. Her complaint has four counts. She asserts that Class Appraisal discriminated against her in violation of the Americans with Disabilities Act (as amended in 2008) and Michigan's Persons with Disabilities Civil Rights Act. Masters also alleges that Class Appraisal retaliated in violation of those two acts.

In September 2018, Class Appraisal moved for summary judgment. (ECF No. 14.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

The Court first addresses Masters' discrimination claims under the Americans with Disabilities Act, then her ADA retaliation claim, and then her claims under Michigan's Persons with Disabilities Civil Rights Act.

### A.

Before analyzing Masters' claim of discrimination under the ADA, the legal framework for analysis must be put in place. In her summary-judgment response brief, Masters applied the burden-shifting framework established in *McDonnell-Douglas Corp v. Green*, 411 U.S. 792 (1973). (ECF No. 17, PageID.346.) But upon reviewing Masters' complaint, her brief, and the record, it appeared to the Court that Masters' was claiming that Class Appraisal did not provide her with a reasonable accommodation for her multiple sclerosis. And where an ADA plaintiff makes that type of claim, she is asserting that she has "direct" evidence of discrimination (i.e., the employee's disability, and the employer's decision not to accommodate it, was the reason the employee did not keep the job). *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182–83 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012); *accord Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) ("Claims that allege a failure to accommodate necessarily involve direct evidence." (internal quotation marks and citation omitted)); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007). And so it appeared to the Court the *McDonnell-Douglas* framework, which serves to ferret out an employer's intent when it is not clear that the adverse employment action was based on the employee's disability, had no role to play in this case. *See Hostettler*, 895 F.3d at 852–53; *Monette*, 90 F.3d at 1182, 1184. The Court has raised this issue with the parties (ECF No. 24), and at oral argument, both sides agreed that Masters was asserting that Class Appraisal did not provide her with a reasonable accommodation.

Properly characterizing Masters' claim of discrimination not only "jettison[s]" the *McDonnell-Douglas* framework, *Kleiber*, 485 F.3d at 869, it also dictates which party has the burden to prove what. When, as here, an employee says that she was not provided with a reasonable

accommodation, she has the initial burden of showing that the accommodation she requested—here, working at home on a full-time basis—was objectively reasonable. *Monette*, 90 F.3d at 1183. The employee might discharge her initial burden by showing that a "cost-benefit analysis" tips in her favor or by showing that comparable employers give comparable accommodations. *See id.* at 1183 n.10. "Once a determination is made that a proposed accommodation is, in a sense, 'generally' reasonable, the defendant employer then bears the burden of showing that the accommodation imposes an undue hardship upon it, given the employer's specific situation." *Id.* at 1183 n.10.

So has Masters discharged her initial burden?

That the Court struggles to answer this question is a byproduct of the briefing and record the parties have supplied the Court. Class Appraisal cites a number of laws that, in its opinion, rendered at-home work infeasible. One is the Gramm-Leach-Bliley Act, and in particular, that Act's "Safeguards Rule." (ECF No. 14, PageID.88.) But FTC guidance on the Safeguards Rule does not mandate a specific technology or a specific protocol for keeping appraisal information secure and private. *See* FTC, *Financial Institutions and Customer Information: Complying with the Safeguards Rule* (April 2006), https://bit.ly/2bNr0S1 (indicating that a company's particular implementation of the Safeguard Rule depends on "the company's size and complexity, the nature and scope of its activities, and the sensitivity of the customer information it handles"); *see also* 15 U.S.C. § 6801(b) (referencing generally "the security and confidentiality of customer records and information"); 16 C.F.R. § 313.10 (prohibiting, without specific implementation details, the disclosure of "any nonpublic personal information about a consumer to a nonaffiliated third party"). For instance, the FTC advises companies to "know where sensitive customer information is stored and store it securely" and provides that [i]f [your company] must transmit sensitive data

by email over the Internet, be sure to encrypt the data." This advice does not dictate that Class Appraisal keep data secure by having all employees work on-site nor does it give much insight into the feasibility of maintaining data security while an employee works at home. So mere reference to the Safeguards Rule does little to show that a work-at-home accommodation was unreasonable.

Class Appraisal cites other laws with which it was required to comply, but citing these laws likewise does little to advance a cost-benefit analysis. Class Appraisal points to a Michigan statute requiring appraisal management companies to "periodically review the work of appraisers." (ECF No. 14, PageID.88.) But the statute does not say how that review must be done. Perhaps that could be done remotely. And if it could, the summary-judgment record gives no indication of the cost to Class Appraisal of doing so. Class Appraisal also makes very cursory references to other laws (e.g., Dodd-Frank Act) but does not tell the Court what those laws specifically demanded in terms of security and confidentiality of appraisal information. (ECF No. 14, PageID.98.)

And looking beyond the laws cited by Class Appraisal, the summary-judgment record is mostly bereft of Class Appraisal's information-technology capabilities at the time Masters worked there. Backonen, Class Appraisal's former CEO, seemed to think that Masters worked at home using a virtual private network. (ECF No. 17, PageID.434.) Stoops mentioned a program called Therex, but that seems to be the software Class Appraisal used to obtain appraisals—not the software that Masters used to review them. (See ECF No. 14, PageID.236.) For her part, Masters said she used an online program made by Mercury Network for appraisal review and, apparently, for email. (ECF No. 17, PageID.384, 388.)

While these deficiencies in the record suggest that Masters has not discharged her initial burden of showing that a work-at-home accommodation was reasonable, the Court narrowly finds

that she has. Start with the cost to Class Appraisal of providing the accommodation. Common sense suggests that Class Appraisal could have had Masters sign an agreement ensuring that she would not print or download any appraisal information and that she would not show anyone in her home (or elsewhere) any appraisal information. Of course, Masters might breach an agreement like that, but Class Appraisal could have substantially reduced those odds by tying breach to harsh sanctions. Moreover, nothing in the summary-judgment record shows that employees working at Class Appraisal's facility were monitored so closely that they were unable to, say, secretly take home a printout or download a file to a flash drive. So, in that respect, a reasonable jury could think Masters' home environment was about as physically secure as the workplace. As for digital security, the software that Masters used, Mercury Network, was presumptively secure. As a designer of online, appraisal-review software, Mercury would presumably ensure that their software complied with the digital security mandates of the Gramm-Leach-Bliley Act and other similar laws. (In fact, although extra-record material, that appears to be entirely true. *See* Mercury Network, *Appraisal Operations and the Gramm-Leach-Bliley Act* at 12–13 (2013), https://bit.ly/2mgaK27.) Consider too that Masters—along with three or four other Class Appraisal employees—worked at home for about three months. Indeed, Class Appraisal is adamant that, several years after these privacy regulations had been in place, they voluntarily initiated a work at home program. Nothing in the record suggests that during the work-at-home period there was any security or privacy breach. And nothing suggests that during that time Class Appraisal was ever accused of not keeping appraisal information private and secure.

As for the benefit side of the equation, a reasonable jury could find that Masters was just as productive (perhaps more so) when working at home. So a reasonable jury could find that by

keeping Masters as an employee, Class Appraisal would have not only benefitted Masters, but itself.

In all, taking the record in the light most favorable to Masters and drawing all reasonable inferences in her favor, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and adding in a bit of common sense, the Court narrowly finds that Masters has discharged her initial burden of showing that a work-at-home accommodation was objectively reasonable for an appraisal reviewer. *See Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 781 (6th Cir. 1998) ("The employee's initial burden of articulating a reasonable accommodation need not be onerous. For the purposes of a prima facie showing, the plaintiff must merely suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.").

So the burden shifts to Class Appraisal to show that keeping appraisal information secure while Masters worked at home would have imposed an undue hardship. *Monette*, 90 F.3d at 1183. What has already been said about the deficiencies in the summary-judgment record adequately explains why Class Appraisal has not carried its burden. The Court only adds that while the record certainly provides that Class Appraisal's concern over data security led to the termination of the work-at-home program (ECF No. 14, PageID.201–203), the record also indicates that was only one of three reasons the program was terminated. The program was cancelled in part because Class Appraisal had moved to a larger facility (and thus no longer had space issues) and in part because Class Appraisal had difficulty monitoring the productivity of those that worked at home. (ECF No. 14, PageID.300.) That there were other motivations for terminating the work-at-home program apart from data security casts some doubt on Class Appraisal's claim that data security concerns rendered the work-at-home program "not feasible." (ECF No. 14, PageID.85.) And again, Class

Appraisal has not adequately explained how giving Masters access to appraisals to review from her computer at home as opposed to her computer at work imposed an undue hardship.

To sum up so far, a reasonable jury presented with the record now before the Court could find that Masters' request to work at home on a full-time basis was reasonable, i.e., that it was not an undue hardship for Class Appraisal to have secured Masters' home environment such that she could review appraisals at home while complying with the Gramm-Leach-Bliley Act (and similar laws).

Remaining, then, is whether a reasonable jury could find for Masters on the other elements of an ADA discrimination claim. *See* 42 U.S.C. § 12112(b)(5)(A); *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016). It could. No one asserts that Masters' multiple sclerosis was not a disability under the ADA. *See* 42 U.S.C. § 12102(2)(A). It is undisputed that Class Appraisal did not allow Masters to work at home, which, as explained at length, was arguably a reasonable accommodation for her disability. And given that Masters' physician stated that it was "medically necessary" for her to work at home (ECF No. 17, PageID.467; *see also* ECF No. 17, PageID.442), a reasonable jury could find that Class Appraisal's proposal of a parking space close to the building and a desk close to the bathroom was not a reasonable accommodation. And it appears that Masters was "otherwise qualified" to do her job (indeed, she reviewed appraisals without issue for nearly a year). *See* 42 U.S.C. § 12112(b)(5)(A). All said, a reasonable jury could find that Class Appraisal denied an otherwise qualified employee a reasonable accommodation for her disability and thus discriminated in a manner that the ADA prohibits. *See id.*

**B.**

Before turning to Masters' retaliation claim under the ADA, there is one additional, related discrimination claim to address. In particular, Masters asserts that Class Appraisal failed to explore reasonable accommodations in the manner that the ADA requires. (*See* ECF No. 1, PageID.7.)

Regardless of whether an employer ultimately provides a requested accommodation, the ADA requires employer and employee to engage in an "interactive process" to explore possible accommodations. *See* 29 C.F.R. § 1630.2(o)(3); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (providing that interactive process is mandatory). "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). "[B]oth parties have a duty to participate in good faith" and when there is a breakdown in the process, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Kleiber*, 485 F.3d at 871 (internal quotation marks and citation omitted).

Class Appraisal suggests that it is entitled to summary judgment on this related claim of discrimination because it was Masters—not Class Appraisal—who failed to participate in good faith. Class Appraisal states that Masters "was not willing to discuss any accommodation other than [a] full time, indefinite, work from home status." (ECF No. 14, PageID.101.) And, says Class Appraisal, it offered Masters in-office accommodations and repeatedly stated that it would discuss other in-office accommodations. (*See id.*) Despite its effort, Class Appraisal stresses, Masters remained fixated on a work-at-home accommodation. (*See id.*) So in Class Appraisal's view, it was her, not it, that caused the interactive process to break down.

While that is one interpretation of the record, it is not the interpretation most favorable to Masters. *See Matsushita*, 475 U.S. at 587. To be sure, the email communications and Masters'

deposition testimony make plain that the only accommodation she wanted was to work at home. (*See* ECF No. 14, PageID.136–137; ECF No. 17, PageID.471–473.) But the record also permits a reasonable jury to find that working at home was the only reasonable accommodation for Masters' multiple sclerosis. (*See* ECF No. 14, PageID.136–137; ECF No. 17, PageID.467 (providing that work-at-home was "medically necessary").) And even if it were true that Masters' disability could be accommodated at Class Appraisal's worksite, there are several aspects of the record that could lead a reasonable jury to find that Class Appraisal was the party that caused the interactive process to breakdown.

First, when Class Appraisal terminated the work-at-home program, it never provided Masters with a good explanation as to why she could no longer work at home. Prior to setting Masters' status to voluntary resignation, all Class Appraisal ever told her was that the pilot program had created a "hardship for the company." (ECF No. 17, PageID.423, 472, 474.) Class Appraisal never explained its data-security concerns to Masters. A reasonable jury could find that Class Appraisal's refusal to provide Masters with an explanation of why she could no longer work at home left Masters perplexed as to why what she had done for three months was no longer viable. And with that confusion, it makes sense that Masters' emails to Stoops largely reiterated that she was not part of a pilot program but had been given work-at-home status as an accommodation for her multiple sclerosis. Had Class Appraisal explained that the issue was data security, the conversation could have advanced to a discussion of how data could be kept secure while Masters worked at home.

Second, a reasonable jury also could question whether Class Appraisal cared to fully understand Masters' physical limitations. In response to a note from Masters' physician, Stoops simply stated that the note was placed in Masters' personnel file, that he had consulted with the

"HR team regarding your request to work from home," and that all positions outside the office had been "eliminated." (ECF No. 17, PageID.474.) Stoops made no mention of Masters' physical limitations and asked no questions about them. As for Backonen, he had no clue as to Masters' physical limitations and his emails likewise reflect little curiosity in learning about them. (ECF No. 17, PageID.481 ("I do not know anything about your condition"); ECF No. 17, PageID.482 ("Jennifer, I have no knowledge what your condition is and have never discussed it in any detail with anybody.").)

Third, Masters repeatedly asked for a face-to-face meeting to discuss her work-at-home request. (ECF No. 17, PageID.469–473.) Yet Class Appraisal never agreed to one. A face-to-face meeting would have been extremely helpful in this case. Such a meeting would have allowed a detailed exploration into Masters' physical limitations—something that never occurred in any of the emails. It would have also allowed Class Appraisal to provide a detailed explanation about the security risks of at-home work. In fact, that type of candid, in-person back-and-forth might have avoided this litigation altogether.

Finally, to the extent that Class Appraisal would point to Hamameh's emails to Masters, those, too, never explained that Class Appraisal could not permit work-at-home because of data-security concerns. Nor did Hamameh ever ask what specifically kept Masters from coming into the office. In any event, Stoops had set Masters' status to voluntary resignation long before Hamameh ever reached out in an attempt to negotiate an accommodation. (ECF No. 17, PageID.469.)

Thus, taking the record in the light most favorable to Masters, a reasonable jury could find that it was Class Appraisal, and not Masters, that was the stumbling block to finding an

accommodation that worked for both sides. Class Appraisal is thus not entitled to summary judgment on Masters' interactive-process claim.

**C.**

Up next is Masters' retaliation claim under the ADA. In her complaint, she asserts, "After Plaintiff advised Stoops of her rights under the [ADA (as amended)] and made reference to the EEOC, Stoops and Backonen terminated her." (ECF No. 1, PageID.7.)

It may be that Masters has given up on this claim. Class Appraisal has argued that it is entitled to summary judgment on Masters' ADA retaliation claim. (ECF No. 14, PageID.87, 102–103.) Yet Masters' response brief does not even include the word "retaliation." (*See generally* ECF No. 17.) While not responding to a summary-judgment motion does not equate to abandonment of a claim, the inference here would be a fair one given that Masters addressed Class Appraisal's other arguments in her response brief.

Abandoned or not, no reasonable jury could find for Masters on her claim of retaliation. On January 23, 2013, Stoops told Masters that if any employees decided that they were unable to come into the office, Class appraisal would "accept this decision from the employees as a voluntary resignation" and then gave Masters until January 24, 2013 at 5:00 p.m. to respond with her decision. (ECF No. 17, PageID.474.) At the time of this ultimatum, Masters had not yet mentioned the ADA or the EEOC. That did not happen until the next day. (ECF No. 17, PageID.471.) And Stoops' response to that January 24 email suggests that he thought that Class Appraisal was in compliance with the EEOC guidelines Masters had cited. (*See* ECF No. 17, PageID.470.) Ultimately, Stoops followed through with his ultimatum, setting Masters' status to voluntary resignation effective January 24 at 5:00 p.m. (ECF No. 17, PageID.469.) Given that Stoops threatened termination before Masters ever referenced the ADA or EEOC, that Stoops personally

believed Class Appraisal was in compliance with the EEOC guidance Masters cited, and that Stoops followed through on his threat, it appears that Masters' reference to the EEOC or the ADA made little, if any, difference to Class Appraisal's decision to terminate her employment. Or restated in legal terms, no reasonable jury could find that absent her reference to the EEOC and the ADA, Masters would have kept her job. *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015) ("To prevail on a retaliation claim [under the ADA], a plaintiff must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." (internal quotation marks omitted)). Class Appraisal is thus entitled to summary judgment on Masters' retaliation claim under the ADA.

## D.

Remaining are Masters' claims under Michigan's Persons with Disabilities Civil Rights Act.

The Court will be brief. It is possible that there are material differences between a claim brought under the ADA and one brought under the PWDCRA. But if there are such differences, the parties have not identified them. Class Appraisal's motion for summary judgment treats state and federal law as one and the same (ECF No. 14, PageID.83 n.1); Masters' response brief does not even mention the PWDCRA (*see generally* ECF No. 17). When the parties make no effort to distinguish parallel federal and state laws, it is not this Court's practice to hunt for distinctions. *See, e.g.*, *Haydar v. Amazon Corp., LLC*, No. 2:16-CV-13662, 2018 WL 4282777, at *22 (E.D. Mich. Sept. 7, 2018). So the Court will dismiss Masters' retaliation claim under the PWDCRA, but her discrimination claims under the PWDCRA (*see* ECF No. 1, PageID.8, ¶ 56) will proceed to trial as discussed above.

**IV.**

For the reasons stated, the Court will GRANT IN PART and DENY IN PART Class Appraisal's motion for summary judgment. (ECF No. 14.) Masters' claims of retaliation under the ADA and the PWDCRA are DISMISSED WITH PREJUDICE. Masters' claims of discrimination under the ADA and the PWDCRA will proceed to trial.

SO ORDERED.

Dated:  September 23, 2019

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE